UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
Chyrsi Dimitriakios,

        *Plaintiff*,

                                  **MEMORANDUM AND ORDER**

      v.

                                  17-CV-00009(KAM)

Andrew M. Saul, *Commissioner*
*of Social Security*,[1]

        *Defendant*.
---------------------------------X
**MATSUMOTO, United States District Judge:**

      Pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3),

Plaintiff Chyrsi Dimitriakios ("Plaintiff"), on behalf of her

minor son, EAD ("Claimant"), appeals the final decision of

defendant Andrew M. Saul, Commissioner of Social Security

("Defendant," or the "Commissioner"), denying Claimant's

application for Supplemental Security Income ("SSI") benefits

pursuant to Title XVI of the Social Security Act (the "Act").

Plaintiff, who is represented by counsel, argues that she is

entitled to receive SSI benefits on behalf of her son due to her

son's severe medically determinable impairments, including

speech and language disorders, asthma, and learning

---

[1] Plaintiff commenced this action against Carolyn W. Colvin, as Acting
Commissioner of Social Security. On January 21, 2017, Nancy A. Berryhill
became the Acting Commissioner of Social Security, and on June 17, 2019,
Andrew M. Saul became the Commissioner of Social Security. Because Carolyn
W. Colvin was sued in this action only in her official capacity, Andrew M.
Saul is automatically substituted for Carolyn Colvin as the named defendant.
*See* Fed. R. Civ. P. 25(d). The Clerk of the Court shall amend the caption in
this case as indicated above.

1

disabilities, that render him disabled.  (*See generally* ECF No.
1, Complaint ("Compl.").)

Presently before the Court are the parties' cross-
motions for judgment on the pleadings.  (ECF No. 11, Plaintiff's
Motion for Judgment on the Pleadings ("Pl. Mem."); ECF No. 15,
Defendant's Motion for Judgment on the Pleadings ("Def. Mem.");
ECF No. 16, Defendant's Reply Memorandum of Law in Further
Support of His Motion for Judgment on the Pleadings.)  In the
alternative, Plaintiff seeks remand for further administrative
proceedings.  (*See* Def. Mem.; Pl. Mem.)  For the reasons set
forth below, Defendant's motion is denied, Plaintiff's motion is
granted in part and denied in part, and the case is remanded for
further proceedings consistent with this opinion.

## I.   BACKGROUND

### a.   Claimant's Personal History

Claimant, EAD, was born on January 4, 2006, and was
nine years old and in the third grade on June 19, 2015, the date
of the ALJ hearing.  (ECF No. 17, Administrative Transcript
("Tr."), 9, 12, 46.)  He lives with his mother, his father, his
grandmother, and his sister.  (Tr. 46.)

As an infant and toddler, EAD was treated for
bronchitis and infections and ultimately diagnosed with asthma.
(Tr. 224-312.)  In April 2006, EAD was treated for an "upper
respiratory infection"; in May 2006, he was treated for

bronchiolitis; in August 2006, he was treated for "upper respiratory infections"; and in December 2006, he was treated for pneumonia. (Tr. 224-25.)

In May 2007, EAD was diagnosed as suffering from asthma and placed on Albuterol, Xopenex, and Orapred. (Tr. 260-63.) In September and October 2007, he was seen for a wet, wheezing cough and was diagnosed with bronchiatitis and also prescribed antibiotic Zithromax. (Tr. 260-61.)

At age 3, EAD's pediatrician noted that less than half of his speech was understandable, and he was diagnosed with a speech disorder and referred for a speech evaluation. (Tr. 246-47.) EAD began receiving services at the age of four for both speech and language and occupational therapy. (Tr. 46.) By age 5, EAD was noted to be receiving both speech and language and occupational therapy in his kindergarten classroom. (Tr. 237-39.) EAD continued to receive both speech and language and occupational therapy and remained in an integrated co-teaching classroom through the relevant time period.

b. EAD's Testimony

EAD appeared before the ALJ, who appeared unable to hear EAD and turned off the fan in the room. (Tr. 43.) EAD correctly answered that his birthday was on January 4. (*Id.*) He was unable to answer what he received as a present. (*Id.*) The ALJ asked EAD what he would have liked to have received for

his birthday, suggested to EAD that he wanted a bicycle, and then asked if EAD knew how to ride a bicycle, to which EAD responded, "Yes." (Tr. 44.) She then asked EAD's favorite class and he responded, "before 11." (Tr. 44.) EAD nodded his head rather than providing an oral answer and was directed by the ALJ to answer twice. (Tr. 43-44.) The ALJ and Plaintiff prompted EAD as to whether he liked math, reading, or science, and he indicated that science was his favorite subject and that "we study electricity, magnetic force." (Tr. 44.)

      c.   Plaintiff's testimony

Plaintiff testified that EAD was in third grade at P.S. 176 when he was receiving speech and occupational therapy, and that he had been receiving those services since he was four years old. (Tr. 46.) She testified that she had EAD evaluated for speech and language delays after his nursery school teacher told her EAD had delays. (Tr. 46-47.) Plaintiff testified that the speech therapy improved his language, but that she "kept him in" therapy because his teacher, Ms. Grainey, said it would help and that he had "very bad" handwriting and that "his writing his thoughts down is very scattered." (Tr. 47.) She testified that EAD had an Individualized Education Program ("IEP"). (Tr. 48.) She testified that EAD had 2 special education teachers and a "para." (Tr. 49.) Plaintiff testified that the prior year, EAD had a lot of behavioral issues in school and was doing better

this year in school but was still having behavioral problems at
home such as talking back, slamming doors, throwing toys and not
listening. (Tr. 50.) Plaintiff testified that EAD has three or
four friends who are the children of her friends and that he has
one friend in school but that he does not see that child outside
of school. (Tr. 50-51.) She testified that he misuses words.
(Tr. 53.) Plaintiff testified that EAD can't complete things
and that she has to "yell at him to pick up his own toys." (Tr.
54.) Plaintiff testified that EAD is "not so good" at
interacting with others and that he gets into fights with the
only friends he has and "has issues agreeing with the kids."
(Tr. 54-55.) Plaintiff testified that EAD has no issues with
moving about and manipulating objects but that with regard to
caring for himself, he is limited, and that she picks up his
clothes. (Tr. 54.) Plaintiff testified that EAD had trouble
with math, English, writing, and penmanship. (Tr. 57.)
Plaintiff testified that EAD needed help with English and math
homework and needed to be pushed to complete his homework. (Tr.
58.) Plaintiff testified that EAD has never been hospitalized
for asthma but that they use a nebulizer unit "all the time" and
defined that to mean that EAD would use it daily in the winter.
(Tr. 59.)

d. <u>Testimony of Dr. Chandrasekhar</u>

Dr. Sree Devi Chandrasekhar, an internist who had not personally examined Claimant but who had been provided with his medical and educational records prior to the date of the hearing, testified at the request of the Commissioner of Social Security that EAD's doctors had treated him for bronchitis, upper respiratory infections, and well-child care. She indicated that the records showed a mild intermittent asthma. (Tr. 61.) Dr. Chandrasekhar noted that EAD had been seen by consultative examiner Mindy Singer in 2013, who noted "normally emerging speech and language skills." (Tr. 61.) Dr. Chandrasekhar noted that at the second evaluation in March of 2015, Dr. Singer found "mild receptive and expressive delay. Still she didn't make any recommendation for that." (Tr. 62.) She noted further that educational records showed that EAD was functioning at 1.5 at the age of seven years and that reading and math were on grade level. (Tr. 62-63.) Dr. Chandrasekhar found that EAD had a less than marked impairment with acquiring and using information; no limitation in attending and completing tasks; a less than marked limitation in interacting with others due to speech; no limitation with manipulating objects; no limitation in caring for himself; and a less than marked limitation due to asthma in health and physical well-being. (Tr. 63-64.) When asked if she considered the teacher's

questionnaire at 5E, Dr. Chandrasekhar stated, "well, the thing, first of all, it's they're not . . . medical exhibits. I do look at the E exhibits sometimes, if it's important to my opinion. And that has not been followed up by any psychiatrist or psychologist. So I cannot just take that fact." (Tr. 65.)

## II. CLAIMANT'S MEDICAL HISTORY

Because Plaintiff is not alleging that there was error with regard to the finding that EAD has less than a marked limitation regarding the domain of health and well-being, the Court does not address the medical records in detail. Records from Gabriel Pediatrics indicate that EAD was treated for asthma, bronchitis, sinusisits, and infection from January 2006 through January 2014. (Tr. 224-312.)

## III. CLAIMANT'S PSYCHOLOGICAL AND EDUCATIONAL HISTORY

### a. Claimant's Individualized Education Program

#### i. *2013 IEP*

EAD's 2013 IEP, dated April 12, 2013, indicated that he was a first-grader then in an integrated co-teaching classroom and that he eagerly participated in therapy. (Tr. 313.) It notes that his intelligibility had improved significantly but that he struggled in phonemic awareness and was reading below grade level. (*Id.*) It notes that he "struggle[d] with identifying sounds in words and blending consonants and syllables" and that "his expressive language

[was] about one year delayed as measured by the Expressive Word Picture Vocabulary Test." (*Id.*)  The IEP recommended continued speech and language therapy, which EAD had received twice a week, and noted that he also "[was] receiving OT (occupational therapy) services in order to address some deficits in visual motor skills and ability to attend to task and follow multi-step directions."  (Tr. 313-314.)  It further noted that EAD "continue[d] to have some difficulty writing in class primarily due to poor attention to task and becoming easily distracted."  (Tr. 314.)  It recommended that he continue with occupational therapy and further recommended that he "stay in the [Integrated Co-Teaching ("ICT")] setting where he [would] receive the extra support of two teachers.  At this time he [would] not be mainstreamed in any of the major subject areas."  (*Id.*)

      ii.    *2014 IEP*

EAD's 2014 IEP, dated December 14, 2014, stated that he is approaching grade level and "ha[d] excellent fluency and decoding skills."  (Tr. 432.)  It noted, however, that he "[could] become easily distracted when reading and need[ed] refocusing to maintain comprehension of the text.  At times, EAD need[ed] prompting when answering text-based questions.  Writing [was] where EAD struggles most in literacy.  He ha[d] poor handwriting skills, and struggle[d] with adding correct punctuation in his pieces.  EAD struggle[d] with organizing his

ideas in sequential order and adding enough details to support his ideas.  In math, EAD [was] able to compute numbers, but he struggle[d] with math word problems."  (Tr. 432.)

With regard to language skills, the IEP stated that EAD then "receive[d] speech and language services twice a week. EAD ha[d] made significant progress in phonemic awareness.  He [was] now reading on grade level.  However, EAD continue[d] to struggle communicating his thoughts in written medium.  He ha[d] trouble organizing his thoughts and expanding them into a cohesive paragraph.  He exhibit[ed] deficit in a variety of words, pronoun usage, morphological endings, appropriate verb tenses and punctuation.  It [was] recommended that speech and language therapy continue."  (*Id.*)

With regard to physical development, it was again noted that EAD exhibited distractibility and poor attention.  It was noted that he had been taught strategies to deal with that issue but had not used them.  (Tr. 433.)  It noted that "EAD [was then] being seen in occupational therapy to address impulsivity, rigidity, lack of self-awareness, and focus/sustained attention. . . .  He ha[d] great initiation skills but needs to work on pacing."  (*Id.*)  It further noted that "[d]ue to his cognitive impulsivity, he usually act[ed] or respond[ed] to questions before thinking things through."  (*Id.*)

The IEP recommended that he continue twice weekly occupational therapy sessions.  (*Id.*)

      b.   Claimant's Social Security Administration
          Consultative Speech and Language Evaluation

On August 20, 2013 and March 16, 2015 respectively, upon the request of the Social Security Administration, Mindy Singer, MA CCC-SLP, a speech/language pathologist, examined EAD.

In her first consultative examination, which took place on August 20, 2013, Ms. Singer noted that EAD's speech and language developmental milestones had been mildly delayed, with one word emerging between 16 and 20 months, and that EAD had received speech and language therapy. (Tr. 324.)  She noted that EAD was scheduled to be placed in a second-grade education class, and that he was accompanied by his mother and was a "friendly cooperative child" who "remained compliant throughout the evaluation." (*Id.*)  She stated that "attending and focusing skills were judged good," and that EAD's "responses were judged to be thoughtful, deliberate, and persevering, with no evidence of distractibility or impulsivity." (*Id.*)  Ms. Singer noted that voice pitch, rate, quality and intensity were appropriate. (Tr. 325.)  She found no dysfluent speech patterns. (*Id.*)  She found that EAD's hearing appeared adequate for a one-to-one testing situation. (*Id.*)

Ms. Singer administered the Clinical Evaluation of Language Fundamentals, Fourth Edition (CELF-4), which revealed that in "concepts and following directions" EAD was in the 50th percentile at mean; that in word classes he was in the 63rd percentile at +1 deviation; that in sentence structure he was in the 16th percentile at -1 deviation; that in word structure he was in the 25th percentile at -1 deviation; that in recalling sentences he was in the 25th percentile at -1 deviation; and that in formulating sentences he was in the 50th percentile at mean. (Tr. 325.)  His overall core language score was in the 34th percentile.  (*Id.*)  She stated that "[t]he results obtained indicated normally developing receptive and expressive language skills."  (*Id.*)

Ms. Singer administered the Goldman-Fristoe 2 Test of Articulation and stated that EAD obtained no errors.  (Tr. 326.) She diagnosed EAD with "[n]ormally developing receptive and expressive language skills," recommended that he not receive speech and language therapy, and noted his prognosis as "fair." (*Id.*)

In her second consultative examination, which took place on March 16, 2015, Ms. Singer again noted that EAD's speech and language developmental milestones has been mildly delayed, with "one-words" emerging after age 2, and that EAD had received speech and language therapy.  (Tr. 424.)  She

(incorrectly) noted that EAD, who was in a third-grade general education class and who was accompanied by his father, was a "friendly, outgoing child" who "followed requests appropriately." (*Id.*) She stated that "[a]ttending and focusing skills were adequate" and that EAD's "responses were judged to be thoughtful, deliberate, and persevering, with no evidence of distractibility or impulsivity." (*Id.*) Ms. Singer noted that voice was "[a]ppropriate for age and gender." (Tr. 425.) She found no dysfluent speech patterns. (*Id.*) She found that EAD's hearing appeared adequate for a one-to-one testing situation. (*Id.*)

Ms. Singer administered the Clinical Evaluation of Language Fundamentals, Fourth Edition (CELF-4), which revealed that in "concepts and following directions" EAD was in the 5th percentile at -2 deviation; that in word classes receptive he was in the 9th percentile at -2 deviation; that in receptive language he was in the 5th percentile with no deviation given; that in recalling sentences he was in the 16th percentile at -1 deviation; that in formulating sentences he was in the 9th percentile at a -2 deviation; that in word classes/expressive he was in the 16th percentile with a -1 deviation; and that in word classes total he was in the 9th percentile with -2 deviation. (Tr. 425.) His overall core language score was in the 5th

percentile.  (*Id.*)  Ms. Singer noted this to be "mild receptive and expressive language delays."  (*Id.*)

Ms. Singer administered the Goldman-Fristoe 2 Test of Articulation and stated that EAD had no errors.  (Tr. 426.)  She diagnosed EAD with "mild receptive and expressive language delays," and again recommended that EAD not receive speech and language therapy and noted his prognosis as "fair."  (*Id.*)

### c.  Social Security Administration Teacher Questionnaire

On May 21, 2013, EAD's third-grade reading, math, writing, language arts, science, and social studies teacher, Carolyn Chieffo, completed a teacher questionnaire evaluation of EAD's functioning in school at the request of the Social Security Administration.  (*See* Tr. 170-179.)  The scope of the evaluation covered EAD's day-to-day functioning in school, including the six domains of "Acquiring and Using Information," "Attending and Completing Tasks," "Interacting and Relating with Others," "Moving About and Manipulating Objects," "Caring for Himself or Herself," and "Medical Conditions and Medications/Health and Physical Well-Being."  (*Id.*)

At the time of the evaluation, Ms. Chieffo had known Claimant for nine months, during which time she saw Claimant five days per week.  (Tr. 170.)  Ms. Chieffo also noted that Claimant received speech and language services and occupational therapy.  (*Id.*)  Regarding acquiring and using information, Ms.

Chieffo checked the box indicating that Claimant had no problems. (Tr. 171.)

Ms. Chieffo indicated that EAD had problems functioning on a daily basis with attending and completing tasks. (Tr. 172.) Specifically, she indicated that Claimant had a slight problem paying attention when spoken to directly, sustaining attention during sports or play, carrying out single step instructions, and waiting to take turns. (*Id.*) She indicated that EAD had an obvious problem with changing from one activity to another without being disruptive, working without distracting himself or others, or working at a reasonable pace/finishing on time. (*Id.*) She indicated that EAD had a serious problem with refocusing to task when necessary, carrying out multi-step instructions, organizing his own things and school materials, completing class/homework assignments, and completing work accurately without careless mistakes. (*Id.*) She indicated that EAD had a very serious problem in focusing long enough to finish the task at hand. (*Id.*)

Regarding EAD's interacting and relating with others, Ms. Chieffo did not check either the yes or no box but went on to address each specific function. She indicated that EAD had no problem with following rules, relating experiences and stories, using language appropriate to the situation and listener, interpreting the meaning of facial expressions, body

language, hints, and sarcasm, and in using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (Tr. 173.) She did note that he had a slight problem with playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, respecting/obeying adults in authority, introducing and maintaining relevant and appropriate topics of conversation, and taking turns in a conversation. (*Id.*) Each of these problems were reported as occurring daily. (*Id.*)

Finally, Ms. Chieffo reported that she could understand EAD's speech almost all of the time as a familiar listener after repetition/rephrasing and on the first attempt when the topic was known or unknown. (Tr. 174.) Ms. Chieffo wrote that Claimant did not demonstrate any difficulty in the domain of moving about and manipulating objects. (*Id.*) Regarding Claimant's ability to care for himself, Ms. Chieffo noted no limitations. (Tr. 175.) As to Claimant's medical and physical well-being, Ms. Chieffo noted that there was no medication prescribed for EAD, and that he did not frequently miss school. (Tr. 176.)

## IV. PROCEDURAL HISTORY

On April 13, 2013, Plaintiff filed an application for SSI benefits on behalf of EAD alleging an onset of disability on January 1, 2013 due to behavioral problems and speech and

language delays.  (Tr. 137-142, 159, 164.)  The Commissioner denied EAD's claim on September 13, 2013.  (Tr. 77-88.)

Plaintiff then requested a hearing, which was held before Administrative Law Judge M. Reeves (the "ALJ") on June 19, 2015.  (Tr. 89-91, 39-73.)  At the hearing, Plaintiff appeared with the assistance of counsel and testified on behalf of Claimant.  (Tr. 46-60.)  The ALJ also heard limited testimony from Claimant.  (Tr. 43-45.)  Lastly, an internist, Dr. Sree Devi Chandrasekhar, testified by telephone at the request of the Commissioner of Social Security.  (Tr. 60-73.)

On August 17, 2015, ALJ Reeves issued a decision in which she concluded that EAD was not disabled within the meaning of the Act.  (Tr. 6-31 (citing 20 C.F.R. § 416.924(a)).)  Performing the three-step evaluation process for determining whether an individual under the age of 18 is disabled, 20 C.F.R. § 416.924, discussed further below, the ALJ first found that EAD had not engaged in substantial gainful activity since the date of his application.  (Tr. 12.)  Second, the ALJ found that EAD's asthma, bronchitis and speech delay were severe, medically-determinable impairments that caused more than minimal functional limitations.  (*Id.*)  At the third step, however, the ALJ determined that EAD's impairments did not meet, medically equal, or functionally equal the severity of one of the listed

impairments set forth in Appendix I to Subpart P of Part 404 of the Regulations. (*Id.*)

In determining that EAD's impairments did not functionally equal any listed impairment, the ALJ evaluated EAD's degree of limitation in the six domains set forth in 20 C.F.R. § 416.926a(b) after considering all of the relevant evidence in the case record. (Tr. 13.) After considering Claimant's symptoms, the ALJ determined that Claimant and Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the ALJ's finding that Claimant's impairments did not functionally equal a listing. (*Id.*)

The ALJ found that EAD had a less than marked limitation in the domain of acquiring and using information. (Tr. 18-21.) She wrote that her finding was supported by Exhibit 5E, in which Carolyn Chieffo, Claimant's first grade teacher had stated that EAD had no limitation in acquiring and using information. (Tr. 19.)

The ALJ found that EAD had no limitation in the domain of attending and completing tasks. (Tr. 21-23.) She indicated that the finding was supported by Exhibit 1E, wherein Plaintiff completed a function report that said that EAD was able to finish what he started, and that despite the fact that Plaintiff said she needed to push EAD to finish his math and writing, he

was able to complete homework in other subjects on his own. (Tr. 22.)  Additionally, the ALJ noted that despite the fact that Ms. Chieffo stated in her teacher questionnaire that EAD had obvious, serious, or very serious problems with regard to most functions in this domain, he only had slight problems in paying attention when spoken to directly, sustaining attention during sports or play, carrying out single step instructions, and waiting to take turns.  (*Id.*)

The ALJ addressed the 2013 IEP, wherein it was noted that EAD was easily districted and exhibited poor attention, as well as the recommendation that he stay in an ICT classroom with additional support and receive occupational and language therapy.  The ALJ stated that although the report indicated that EAD needed extra support, there was no indication that he received extra testing time.  (*Id.*)  The ALJ also addressed the 2014 IEP, which indicated that EAD had "difficulty in writing due to poor attention to task and becoming easily distracted and was attending occupational therapy to address impulsivity, rigidity, lack of awareness, and sustained attention."  (Tr. 22-23.)  Lastly, the ALJ noted that Dr. Chandrasekhar had found that EAD had no limitation in this domain.  (Tr. 23.)

The ALJ found a less than marked limitation in the domain of interacting and relating with others.  (Tr. 23-25.) She indicated that the finding was supported by Exhibits 1E and

4E, wherein Plaintiff said that that EAD had a problem keeping his hands to himself and would get physical around other kids, but said that EAD had friends his own age, could make friends, and generally got along with adults and teachers. (Tr. 24.) She noted that Ms. Chieffo had stated that EAD had slight problems in playing cooperatively, in seeking attention appropriately, in expressing anger, asking permission appropriately, in respecting and obeying adults, and in taking turns in a conversation, and had no problems in other functions listed. (*Id.*) The ALJ noted that EAD's 2013 IEP noted no behavioral problems and that EAD liked "playing outside, reading, swimming, playing video games, and watching television." (*Id.*) She noted that EAD's 2014 IEP showed no social concerns and that his grades were 2's and 3's with the exception that he earned a failing grade in revising writing to clarify detail and in respecting rules and working well in a community. (*Id.*) Lastly, she noted that Dr. Chandrasekhar had indicated a less than marked limitation in this area. (*Id.*)

In finding no limitation in the domain of moving about and manipulating objects, the ALJ cited Exhibit 4E, page 2, because Plaintiff noted that EAD "needed to be active and jump around a lot." (Tr. 25-26.) She also noted that Ms. Chieffo had reported no limitations in this domain, and that Dr. Chandrasekhar had found no limitations in this area. (*Id.*)

The ALJ found no limitation in the area of EAD's ability to care for himself, citing Exhibit 4E and Exhibit 1E, in which Plaintiff stated that EAD could not wash his hair by himself, hang up his clothes, accept criticism, or choose his own clothes, but could take a bath or shower without help, brush his teeth, comb his hair, eat by himself, pick up and put away his toys, obey safety rules, and do what he was told most of the time.  (Tr. 26, 155.)  She noted that Ms. Chieffo found no problems in this domain, and that Dr. Chandrasekhar had noted that there were no limitations in this domain.  (Tr. 26.)

Finally, the ALJ found a less than marked limitation in the area of health and physical well-being, which she concluded from Exhibits 5E and 1F and Dr. Chandrasekar's opinion.  (Tr. 27-28.)  She noted that despite Plaintiff's testimony that EAD used a nebulizer frequently, his asthma appeared well controlled and that in October 2012, a spirometry test indicated that EAD's "severe airway obstruction" was markedly improved with the use of a bronchodialator.  (Tr. 27.)  She noted that Ms. Chieffo found no limitation in this area and that EAD had a wide range of activities which included playing in the schoolyard with peers, playing outside, swimming, playing video games, and watching television.  (Tr. 27-28.)  Lastly, she noted that Dr. Chandrasekhar had noted a less than marked limitation in this area.  (Tr. 28.)

**V.    DISCUSSION**

    a.    Standard of Review

        A district court reviews the Commissioner's decision to "determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations and quotation marks omitted).

        In order to assess the legal standards and evidentiary support used by the ALJ in his or her disability finding, the reviewing court must be certain that the ALJ considered all the evidence. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004); *see also Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968) ("We cannot fulfill the duty entrusted to us, that of determining whether the Hearing Examiner's decision is

in accordance with the Act, if we cannot be sure that he considered some of the more important evidence presented[.]"). An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

Furthermore, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in the light of correct legal standards." *Klofta v. Mathews*, 418 F. Supp. 1139, 1141 (E.D. Wis. 1976), *quoted in Gartmann v. Secretary of Health and Human Services*, 633 F. Supp. 671, 680 (E.D.N.Y. 1986). The Commissioner's determination cannot be upheld when it is based on an erroneous view of the law that improperly disregards highly probative evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

After reviewing the Commissioner's determination, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Butts*, 388 F.3d at 384 (quoting 42 U.S.C. § 405(g)). "Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." *Grace v. Astrue*, No. 11–

cv-9162, 2013 WL 4010271, at *14 (S.D.N.Y. July 31, 2013)

(citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

　　　　b.　Requirements for SSI Eligibility

　　　　An individual under the age of eighteen is considered

disabled under the Act if she has "a medically determinable

physical or mental impairment, which results in marked and

severe functional limitations, and which can be expected to

result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."  42 U.S.C.

§ 1382c(a)(3)(C)(i); *Kittles ex rel. Lawton v. Barnhart*, 245 F.

Supp. 2d 479, 487 (E.D.N.Y. 2003).  Further, although not in

dispute in this case, an individual under the age of eighteen

who "engages in substantial gainful activity" is not eligible

for SSI benefits.  42 U.S.C. § 1382c(a)(3)(C)(ii).

　　　　In order for a claimant under the age of eighteen to

be found disabled, the Act requires that an ALJ conduct a three-

step sequential analysis finding each of the following: (1) that

the claimant is not engaged in substantial gainful activity; (2)

that the claimant has a medically determinable impairment or a

combination of impairments that is "severe" (i.e., the

impairment or combination of impairments cause more than a

minimal functional limitation); and (3) that the impairment or

combination of impairments meets or equals a disabling condition

identified in the listing of impairments set forth in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (a "listed impairment"). *See Jones ex rel. T.J. v. Astrue*, No. 07-CV-4886, 2010 WL 1049283, at *5 (E.D.N.Y. Mar. 17, 2010); *Kittles*, 245 F. Supp. 2d at 488; 20 C.F.R. § 416.924(b)-(d). Equivalence to a listed impairment may be medical or functional. *See Jones ex rel. T.J.*, 2010 WL 1049283, at *5; *Kittles*, 245 F.Supp.2d at 488; 20 C.F.R. § 416.924(d).

Analysis of functional equivalence requires the ALJ to assess the claimant's functional ability in six main areas, referred to as "domains." 20 C.F.R. § 416.926a(b)(1). The six domains – (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for oneself, and (vi) health and physical well-being – are "broad areas of functioning intended to capture all of what a child can or cannot do." *Id.* Functional equivalence is established when the ALJ finds that the claimant has a "marked limitation" in two domains or an "extreme limitation" in one domain. *Id.* § 416.926a(a).

A "marked limitation" is one that "seriously interferes" with a claimant's ability to initiate, sustain, and complete activities. 20 C.F.R. § 416.926a(e)(2). It is "more than moderate, but less than extreme." *Id.* In addition, the regulations further describe a "marked limitation" as what would

be expected with the equivalent of two standard deviations below the mean on standardized testing. 20 C.F.R. § 416.926a(e)(2)(iii). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Jones*, 2010 WL 1049283, at *6 (quoting 20 C.F.R. Pt. 404, Subpart P, App. 1, § 112.00(C) (internal quotation marks omitted)).

An "extreme limitation" is one that "very seriously interferes" with a claimant's ability to independently initiate, sustain, and complete activities. 20 C.F.R. § 416.926a(e)(3). It is designated for the "worst limitations . . . but does not necessarily mean a total lack or loss of ability to function." *Id.* The regulations describe an "extreme limitation" as what would be expected with the equivalent of three standard deviations below the mean on standardized testing. 20 C.F.R. § 416.926a(e)(3)(i), (iii).

c. Application

i. *Failure to Adequately Consider the Record*

Plaintiff argues that the ALJ erred in failing to reconcile her findings with EAD's CELF scores from March of 2015. Specifically, Plaintiff argues that the ALJ failed to

address the fact that EAD's March 2015 test scores showed him to be a least two standard deviations below that appropriate for his age.  The Court agrees with Plaintiff.

The relevant guidance, contained in SSR 09-2p Title XVI: Determining Childhood Disability – Documenting a Child Impairment-Related Functions, 74 Fed. Reg. 7625 (Feb. 18, 2009), provides as follows:

Adjudicators should analyze and evaluate relevant evidence for consistency and resolve any inconsistencies that need to be resolved.  After reviewing all of the relevant evidence, we determine whether there is sufficient evidence to make a finding of disability.  "All of the relevant evidence" means:

The relevant objective medical evidence and other relevant evidence from medical sources;

Relevant information from other sources, such as school teachers, family members, or friends;

The claimant's statements (including statements from the child's parents(s) or other caregivers); and

Any other relevant evidence in the case record, including how the child functions over time and across settings.

*Id.* at 7629-30.  Additionally, 20 C.F.R. § 416.926a addresses resolving inconsistencies in the record and provides as follows:

If there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it.  The interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test.  But it is also our responsibility to ensure that the evidence in your case is complete and consistent and that any material inconsistencies have been resolved.  Therefore, we will use the following guidelines when we resolve concerns about your test scores:

> (A) We may be able to resolve the inconsistency with the information we have.  We may need to obtain additional information; e.g., by recontact with your medical source(s), by purchase of a consultative examination to provide further medical information, by recontact with a medical source who provided a consultative examination, or by questioning individuals familiar with your day-to-day functioning.
>
> (B) Generally, we will not rely on a test score as a measurement of your functioning within a domain when the information we have about your functioning is the kind of information typically used by medical professionals to determine that the test results are not the best measure of your day-to-day functioning. When we do not rely on test scores, we will explain our reasons for doing so in your case record and in our decision.

20 C.F.R. § 416.926a(e)(4)(iii).

Courts in the Second Circuit have recognized the CELF-4 as a valid indicator of a child's ability to function in the domain of interacting and relating to others.  *Miles ex rel JM v. Astrue*, 775 F. Supp. 2d 715 (S.D.N.Y. 2015); *F.M. v. Astrue*, No. 08-CV-4430(CPS), 2009 WL 2242134, at *8 (E.D.N.Y. July 27, 2009).  The fact that EAD's test scores were shown to be two standard deviations below mean is an issue which should have been addressed by the ALJ.

Moreover, the Court notes that there was a marked disparity between EAD's 2013 test scores and EAD's 2015 test scores.  It is significant that EAD's core language score was in the 34th percentile in 2013, and that by 2015, it had dropped to the 5th percentile, despite the fact that EAD had regularly

received speech and language services throughout the intervening period.  The ALJ failed to resolve that inconsistency or the inconsistency that, despite such a sharp decline in functioning in a relatively short time frame while receiving services, Ms. Singer inexplicably recommended against EAD's receiving speech and language services.  This inconsistency is one that should be addressed.

The Commissioner argues that EAD's 2015 test scores were less than two standard deviations below mean and, thus, that Plaintiff's argument must fail because a child must be found to be two standard deviations below mean to have a marked limitation.  The Court disagrees with the Commissioner insofar as the test scores are primarily two standard deviations below mean.  As the overall core language score is two standard deviations below mean, and as the precipitous drop to that level happened during a time when EAD was actively receiving speech and language services, the scores had to be viewed in the context of a child in a supported setting with services in place to help prevent such a decline in functioning.

In assessing whether a child has marked or extreme limitation, an ALJ must consider the amount of assistance that a child is receiving.  Title 20 C.F.R. § 416.926a, which addresses functional equivalence for children, states as follows:  "[W]hen we assess your functional limitations, we will consider all the

relevant factors in Sections 9416.924a, 416.924b and 416.929 including but not limited to . . . [h]ow well you can initiate and sustain activities, how much extra help you need and the effects of structures and supported settings . . . ." 20 C.F.R. § 416.924a(a). Courts in the Second Circuit have routinely found that "special classrooms" fall under the definition of a "supported setting." *See, e.g.*, *Thompson v. Barnhart*, No. 02-CV-4930 (SJ), 2004 WL 896663, at *7 (E.D.N.Y. Mar. 26, 2004).

The Court also notes that the ALJ failed to consider in her decision not only the speech and language services which EAD was receiving, but also the fact that he was learning in a structured setting and receiving additional academic assistance when assessing his test scores in general. The record clearly indicates that EAD has been placed in an ICT classroom and receives academic assistance. The ALJ should have, but did not, address this in her analysis.

On remand, the ALJ shall address these inconsistencies in the record and resolve them. The ALJ shall additionally consider the setting in which EAD has been placed and the supportive services which he receives both academically and with regard to his receptive and expressive language delays. Lastly, the ALJ shall consider the effect that removing EAD from a structured environment would have on his overall functioning.

ii. *Testimony of Dr. Chandrasekhar*

The Commissioner argues in part that the ALJ's
decision was supported by substantial weight insofar as the
ALJ's findings were supported by the testimony of Dr.
Chandrasekhar.  Because we have ordered that the case be
remanded for other reasons, we will only briefly address the
testimony of Dr. Chandrasekhar.

During Dr. Chandrasekhar's testimony, when asked if
she considered the teacher's questionnaire at 5E, she stated,
"well, the thing, first of all, it's they're not . . . medical
exhibits.  I do look at the E exhibits sometimes, if it's
important to my opinion.  And that has not been followed up by
any psychiatrist or psychologist.  So I cannot just take that
fact."  (Tr. 65.)  When asked whether she knew that the
Commissioner's regulations stated that in children's disability
cases the reports of teachers and other school officials were
recognized as important evidence, Dr. Chandrasekhar indicated
that she gave no weight to the reports unless they were
countersigned by a medical expert.  (Tr. 65-66.)

As noted above, SSR 09-2p provides that:

> [E]vidence from other sources who are not medical sources
> and who know and have contact with the child can be very
> important to our understanding of the severity of the
> child's impairment(s) and how it affects day-to-day
> functioning.  These sources include parents and caregivers,
> educational personnel (for example teachers, early

intervention team members, counselors, developmental center
workers and day care works) . . . .

74 Fed. Reg. at 7627.  The SSR expressly addresses

"Comprehensive Evaluations in [Early Intervention] or School

Programs" and "Individualized Family Services Plans ["IFSPs"] or

Individualized Education Programs."  *Id.* at 7628.  Specifically,

it states that:

> We will consider the results of comprehensive evaluations
> we receive.  Children receive comprehensive evaluations
> when they are candidates for EI or special education and
> related services and periodically after that when they
> receive services.  These evaluations are usually conducted
> by a team of qualified personnel who can assess a child in
> all areas of suspected delay or educational need.

*Id.*  The SSR addresses IFSPs and IEPs as well, stating that

"[b]oth ISFPs and IEPs are important sources of specific

information about a child's abilities and impairment-related

limitations, and provide valuable information about the various

kinds and levels of support a child receives."  *Id.*

It was improper for Dr. Chandrasekhar to discredit the

evidence under the theory that it was not "medical evidence."

The records of qualified educational professionals were evidence

which Dr. Chandrasekhar was required to consider and her

statement that she at times did not even review such evidence

was clearly an error which the ALJ should have, but did not,

address.  The ALJ's reliance upon the testimony of Dr.

Chandrasekhar is, therefore, flawed.

iii. *Substantial Evidence Review*

As noted above, the Commissioner argues that his decision is supported by substantial evidence and should be upheld. (*See generally* Def. Mem.)  Consideration of whether the Commissioner's disability determination is supported by substantial evidence is improper where remand is warranted due to the ALJ's failure to consider certain evidence or apply the law properly in assessing the evidence.  *See, e.g.*, *Lebron v. Colvin*, No. 13–CV–9140, 2015 WL 1223868, at *23 (S.D.N.Y. Mar. 16, 2015).  Accordingly, the Court does not reach the issue of whether the ALJ's decision was supported by substantial evidence here.

## VI.  CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion for judgment on the pleadings, denies in part Plaintiff's motion to the extent it seeks remand solely for the calculation of benefits, and grants Plaintiff's motion to remand this case for further proceedings consistent with this opinion.

On remand, the ALJ shall:

(1) Explain in specific detail the basis for a determination, if warranted, that Claimant's impairments are insufficient to entitle him to benefits at the third step of the disability determination;

(2) Specifically address the results of the CELF-4 tests administered to Claimant and whether the scores indicate a marked or extreme limitation; and

(3) Specifically consider the amount and the nature of supportive services provided to Claimant and how those services affect Claimant's functioning in each of the six domains, and assess what effect the removal of services would have on Claimant's functioning.

The Clerk of the Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:     Brooklyn, New York
           September 22, 2019

                                   _____/s/_____
                                   Hon. Kiyo A. Matsumoto
                                   United States District Judge